13291

PINER v. STANDARD OIL COMPANY OF NEW JERSEY

(161 S. E., 504)

*Messrs. Buist & Buist* and *C. T. Graydon,* for appellants,

*Messrs. A. Russell McGowan* and *J. D. E. Meyer,* for respondent,

December 8, 1931.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This action, commenced in the Court of Common Pleas for the County of Charleston, September 12, 1928, by Charence S. Piner, as plaintiff, against the defendants Standard Oil Company of New Jersey, a corporation, and R. C. Cooper, is for the recovery of damages against the defendants in the sum of $70,000.00 for alleged injuries sustained by the plaintiff while working in the discharge of his duty as an employee of the said Standard Oil Company, and while working under the direction, control, and supervision of the said R. C. Cooper, his foreman. Issues being joined, the case was tried at the October, 1929, term of said Court, before his Honor, Judge Hayne F. Rice, and a jury, resulting in a verdict for the plaintiff against both defendants in the sum of $15,000.00 actual damages, and against the defendant Standard Oil Company in the sum of $5,000.00 as punitive

damages. From the judgment entered on the verdict, and from the intermediate orders of the trial Judge, the defendants have appealed to this Court, upon exceptions, imputing error in several respects.

For the purpose of a clear understanding of the issues between the parties, we quote herewith the pleadings in the case, omitting immaterial parts:

## COMPLAINT

"Second: That as this plaintiff is informed and believes the defendant, Standard Oil Company of New Jersey, is now and was at the times hereinafter mentioned a corporation created by and existing under the laws of the State of Delaware and owns and operates a Crude Petroleum Oil Refinery and conducts a place of business in the County of Charleston, in the State of South Carolina.

"Third: That, the defendant, R. C. Cooper, is now and was at the times hereinafter mentioned a resident of the County of Charleston, in the said State.

"Fourth: That the defendant, R. C. Cooper, at the times hereinafter mentioned was the foreman and manager of the plaintiff herein and of the department of the said refinery in which this plaintiff received the injuries herein compained of.

"Fifth: That the said R. C. Cooper joined in the tort with the said Standard Oil Company of New Jersey which resulted in the injuries and damage to Clarence W. Piner as herein alleged.

"Sixth: That the said defendants were at the time of the injury of this plaintiff and for years prior thereto, engaged in the distillation and production of motor spirits, illuminating oil, gasoline and various oils and greases from crude petroleum oil. That the distillation of gasoline and oil and crude oil are extra-hazardous on account of the inflammable quality of the products and their likelihood to explode, which fact is and was known to the defendants that such distilla-

tion and handling of highly inflammable petroleum requires accurate and scientific knowledge of chemical products and the characteristics of crude oil and of the products therefrom in order to enable one to take the proper precautions and safeguards for the employees against injury from explosions and fire. That this technical and scientific knowledge, the average uneducated person and layman such as the plaintiff, Clarence W. Piner is, does not possess, and is not in a position to acquire, and that the said Clarence W. Piner did not possess and have such knowledge, but had to and did rely upon the defendants to provide such safeguards, looking to his protection, commensurate with the hazards and dangers to which the said defendants knew or should have known that he was being exposed and subjected to in the performance of his duties, all of which both of the said defendants were aware of by reason of their experience and knowledge in the conduct of this particular industry.

"Seventh: That on or about June 16, 1928, while the said Clarence W. Piner was working in the discharge of his duty as an employee of the Standard Oil Company of New Jersey and while working under the direction, control and supervision of R. C. Cooper, his foreman, he, the said plaintiff, acting under the orders of the said foreman assisted in placing a water hose in the top of a tank containing a highly inflammable petroleum product and was standing at the top of the said tank when suddenly and without warning and through no fault of his, the said tank caught fire and exploded, causing this plaintiff to be violently blown from the top of the tank to the ground and upon and against the concrete fire wall surrounding the same, and instantaneously he was covered with highly inflammable oil and enveloped in flames, fire, gases and vapors and horribly burned, scalded and roasted from his waist to the top of his head and his body otherwise cut and broken as hereinafter more particularly set forth.

"Eight: That the damage and injury to this plaintiff as hereinabove and hereinafter set forth was due to and caused

by the joint and concurrent tortious acts of negligence, carelessness, recklessness, willfulness and wantonness of the defendant Standard Oil Company of New Jersey and R. C. Cooper, as follows, to wit:

"(a) In failing and omitting to properly supervise and direct the work which this plaintiff was ordered to do so as to prevent the injury to this plaintiff.

"(b) In failing and omitting to lay out and furnish a safe and proper place for doing the work which this plaintiff was ordered to do.

"(c) In failing and omitting to adopt a proper method for laying out the work which this plaintiff was ordered to do.

"(d) In directing this plaintiff to pour water into the top of a tank when they knew or should have known that so to do would create static electricity and cause an explosion, without warning this plaintiff of the danger thereof, when they knew or should have known that he was not familiar with the said danger.

"(e) In causing and directing this plaintiff to pour cold water into a tank containing warm oil, gases and vapors when they knew or should have known that the chemical combination was liable to explode, without warning this plaintiff of the dangers thereof, when they knew or should have known he was ignorant of the hazard.

"(f) In causing, directing and permitting this plaintiff to run water into the top of a tank containing highly inflammable oil when they knew or should have known that so to do was particularly dangerous and liable to cause an explosion and injure this plaintiff, when they knew or should have known that this plaintiff was ignorant of the said danger.

"(g) In failing and omitting to direct this plaintiff to put the water in the said tank from the bottom thereof and thereby safeguard the person of this plaintiff and prevent the ignition and explosion of the said oil and the injury to this plaintiff.

"(h) In failing and omitting to direct this plaintiff to use an adjustable suction pipe or other device to get the oil out of the said tank and thereby eliminate the necessity of pouring water in the said tank with the oil.

"(i) In failing and omitting to take the proper measures to safeguard the person of this plaintiff while discharging the orders given to him and in failing and omitting to warn him of the dangers incidental to the discharge of the said orders when they knew or should have known that the plaintiff was ignorant of the peril and jeopardy to which his life was being subjected.

"(j) In directing this plaintiff to do work without first exercising, utilizing and employing a reasonable safeguard, commensurate with the danger involved for the safety and protection of the life of this plaintiff.

"Ninth: That as the result of the said joint and concurrent negligent, careless, reckless, willful and wanton acts of the said defendants and each of them was the joint, proximate and concurrent cause of the injury to this plaintiff and materially, directly and concurrently contributed thereto, and, as a result thereof this plaintiff was hurled from the top of the steel tank on which he was working on to the ground and against the concrete wire wall surrounding the said tank; the back of his head was lacerated, cut and split open for a distance of about five inches; his right cheek was lacerated and severely cut; he was covered with hot oil and enveloped with flame and his body literally roasted from his waist to the top of his head; the collar bone and shoulder blade on his right side were broken, battered and fractured; the cinders and sand upon which he was thrown, ground into his burned flesh and he remained in the hospital swathed in grease and bandages in a semi-conscious condition for weeks after the tragedy; he suffered the most excruciating pain and torture and mental anguish, as a result of his scalds and burns for many, many weeks; he was forced to expend money for medical attention, had to undergo treatment from

numerous physicians and a masseur; his face is permanently scarred and he will carry with him the mark of disfiguration on his face for the balance of his natural life; the bones of his right shoulder and the muscles of his right shoulder and back are permanently injured and as a result of the crushing of the bones in his right shoulder he is unable to lift his right arm more than one-half of its normal position; he had two teeth knocked out and his ribs broken; and, though this plaintiff has undergone and is undergoing treatment from a masseur, he has suffered, is suffering, and will, as he is informed and believes, continue to suffer the remainder of his life, terrible pains in his right shoulder and back; he is a man whose only means of earning a living is by manual labor and who as a result of the permanent injury to his right shoulder and arm has had his earning capacity impaired and decreased, and, as he is informed and believes, he will, for the remainder of his natural life, be unable to provide for his family, and will continue to suffer great pain, inconvenience, and mental anguish, all to his damage in the sum of Seventy Thousand ($70,000.00) Dollars."

## ANSWER OF DEFENDANTS

The defendants filed separate answers, but the answers are practically the same. They admitted the formal allegations of the complaint, admitted that the corporate defendant was engaged in the business alleged by plaintiff, that the plaintiff was an employee of the corporate defendant at the time of his alleged injury, that Cooper, the individual defendant, at the time mentioned in the complaint, was foreman of the pumping department of the refinery of said plant of the corporate defendant, and that the plaintiff was at work in the said department when he received the injuries therein complained of; but they deny practically all other material allegations of the complaint. In addition, the defendants interposed the plea of assumption of risk, contributory negligence and willfulness, and alleged that the

plaintiff's injuries were caused by his carelessness, negligence, recklessness, willfulness, and wantonness.

The question at the threshold of the case, raised under Exceptions 5 and 6, is the charge of error to the trial Judge in refusing the defendant's motion for a nonsuit, made at the close of the plaintiff's testimony. The motion was based upon the ground that there was no proof of what caused the explosion, and that there was no proof of a negligent act of any kind or description on the part of the defendants, or either of them.

In passing upon this question involving the evidence, we do not consider it necessary to review at length the record in the case, but deem it sufficient to make a brief reference to a part of the testimony, since, under the well-recognized rule, in passing upon questions of this nature, the testimony must be reviewed in the most favorable light to the plaintiff.

The testimony tended to show that the plaintiff is an uneducated man, having only attended a country school through the fifth grade, and had never been able to procure any position other than manual labor; and, while he had been working for the Standard Oil Company for some time, the work consisted of manual labor. On the morning of June 16, 1928, when he was injured, he held the position of what was called pumpman helper. In answer to questions as to his rank at this time and regarding his work leading up to the injury, he testified:

"Q. On the morning of June 16th, 1928, who was your next superior above you? A. Morton B. Hunt.

"Q. And what was his position? A Shift pumpman.

"Q. Who else was on that shift? A. Leroy Lahmeyer.

"Q. What was his position? A. Assistant shift pumpman.

"Q. What was your rating? A. Pumpman helper.

"Q. Were there any others on that crew of the same rating as yourself? A. Yes, sir; George Meyer.

"Q. No others? A. Not of my same rating.

"Q. Next above you was Leroy Lahmeyer, and next above him was who? A. Morton B. Hunt.

"Q. What is his position? A. Shift pumpman.

"Q. Next above Hunt was who? A. R. C. Cooper, foreman in charge.

"Q. Next above him was who? A. Assistant Superintendent, J. C. Houston.

"Q. And next above him was the Superintendent? A. Yes, sir.

"Q. That was the highest man there? A. Yes, sir.

"Q. When you reported for duty on the morning of June 16th, 1928, what was the first thing you did? A. Reported to the main pump house.

"Q. What shift did you work on? A. Seven in the morning until 3 in the afternoon.

"Q. When you reported to Morton B. Hunt at the pump house, what orders did you receive? A. Take up my routine work and report back.

"Q. Did you do that? A. Yes, sir.

"Q. What time did you report back and what was your duty? A. Checking up the pumps.

"Q. When did you report back? A. About eight o'clock and hung around until we got orders to load tank cars, hung around about three-quarters of an hour then I was told to go to the pump house.

"Q. How long were you working over there? A. Until near eleven-thirty

"Q. You then reported back to Mr. Hunt? A. Yes, sir.

"Q. What orders did you receive? A. I came back to the main pump house and found Mr. Hunt and Mr. Cooper and Mr. Hunt told me to go to the re-run stills and find Mr. Lahmeyer and Mr. Meyer and give them a hand in placing the hose in 19 tank through the hatch.

"Q. To go to the re-run still and there you would find Mr. Meyer and Mr. Lahmeyer? A. Yes, sir.

"Q. Who gave that order? A. Mr. Hunt, the shift pumper.

"Q. Go over to the re-run still, there you would find Mr. Lahmeyer and Mr. Meyer and give them a hand? A. My orders were to go to the re-run still and there I would find Mr. Lahmeyer and Mr. Meyer and give them a hand to put the hose in 19 tank through the hatch.

"Q. Was Mr. Cooper present when that order was given to you? A. Yes, sir.

"Q. What do you call a pan? A. A line of small tanks near the stills with gravitation from the stills, run into them, they call them pans, they are ten feet high and 40 feet in diameter.

"Q. Were they round tanks? A. Yes, sir.

"Q. They are lined up and designated by numbers? A. Yes, sir.

"Q. The one you were sent to was 19? A. Yes, sir.

"Q. The cover of that tank 19, is what? A. A steel roof.

"Q. With an opening in it? A. A twenty inch square hole in the front of it, you go up, on a steel platform.

"Q. That is what you were alluding to when you said putting the hose through the hatch? A. Yes, sir.

"Q. To get up to the hatch where you were supposed to put the hose what facilities did they have? A. A steel step.

"Q. And that went how near the top edge of the tank? A. About to my waist.

"Q. How wide is the platform? A. About three feet square.

"Q. Had you been near pan or tank 19 that morning? A. No, sir.

"Q. Did you know what it contained? A. No, sir.

"Q. Were you informed what it contained before you went over to it? A. No, sir.

"Q. What was your method or way, what were you using to put water into this tank? A. A regular three-inch water hose.

"Q. A regular fire hose? A. Yes, sir; canvas fire hose.

"Q. How long was it? A. I judge three hundred feet long.

"Q. Where was that hose when you first joined Mr. Lahmeyer and Mr. Meyer? A. I judge 200 feet from 19 pan in one of the other pans.

"Q. What was the number of the tank it was in? A. 15.

"Q. How was it in 15? A. Over the top in the hatch tied in there with a piece of small rope.

"Q. Who released it? A. I did.

"Q. What did you do with it? A. Took the end of the hose down on the ground.

"Q. Then what did you do? A. We dragged it over to 19 tank.

"Q. That was a distance of how far? A. About 250 feet.

"Q. You dragged it from 15 pan to 19 pan, what did you drag it across? A. Cinders and gravel.

"Q. When you got to 19 pan what did you do? A. I took the end of the hose and went up on the platform of 19 pan.

"Q. Where was Mr. Lahmeyer and Mr. Meyer? A. Lahmeyer was outside the fire wall and Meyer was near the hydrant, 1,500 feet away.

"Q. What did you do? A. Put the end of the hose in the tank.

"Q. Then what did you do? A. Then I turned to Mr. Lahmeyer and asked him for some slack.

"Q. Why did you want the slack? A. To put it as far in the tank as I could.

"Q. How far did you put it in the tank? A. I judge, two or three feet.

"Q. How did you place it in that tank compared with the way you took it out of 15 tank? A. Just about the same way.

"Q. Had you ever placed a water hose in those tanks before? A. No, sir.

"Q. Did you know it was dangerous? A. No, sir.

"Q. Had you been warned about it? A. No, sir.

"Q. Had you been told that it was liable to explode? A. No, sir.

"Q. Did you know what was in tank 15 when you took the hose out? A. No, sir.

"Q. And you did not know what was in 19? A. No, sir.

"Q. Were you given instructions by anybody how to place the hose in the tank? A. No, sir.

"Q. I have got you where you asked for a little more slack and had the hose two or three feet in the tank, what happened? A. I started to tie the hose with the same rope that it was tied with in the other tank.

"Q. What were you going to tie it to? A. There is a little knob on the inside of the edge of the hole and I tied it to that in 19, that is where I found it in 15.

"Q. Then what happened? A. I don't know.

"Q. What was the next thing you knew? A. A few days later I woke up in the hospital.

"Q. In the Riverside Infirmary? A. Yes, sir.

"Q. Mr. Piner, do you know about what pressure they used on those water hose? A. About 70 pounds.

"Q. Do you know what kind of water they used in those hose? A. Salt water out of the Cooper River.

"Q. I will ask you what facilities they had at tank 19 for fire fighting? A. A Foamite line.

"Q. I will ask you whether or not you know if the Foamite line leading to tank 19 was blocked off that day? A. No, sir.

"Q. Is it possible to block it off? A. Yes, sir.

"Q. You don't know its condition that day? A. No, sir.

"Q. Pan 19 is situated on what kind of base? A. On the ground.

"Q. Around the tank is what? A. A concrete fire wall.

"Q. About how far from the side of the tank is the fire wall? A. Possibly two or three feet.

"Q. How high does the fire wall stand? A. Three or four feet high.  *  *  *

"Q. Do you know anything about static electricity? A. No, sir.

"Q. Do you know anything about the chemical composition of gasoline or crude oil? A. No, sir.

"Q. Have they ever attempted to teach you that? A. No, sir.

"Q. You were to do as they told you? A. Yes, sir.

"Q. And you did it? A. Yes, sir.

"Q. And that caused you to wake up in the hospital? A. Yes, sir.

"Q. Now, Mr. Piner, do you know whether or not the Standard Oil Company had any means or facilities for placing this water in the bottom of those tanks? A. No other than putting it through the top.

"Q. Did they have any means for putting a suction pipe in the tank and drawing it off rather than raising its level? A. No, sir.

"Q. Now, in the entire six years and eight months that you worked there had you ever placed a hose in that tank before? A. No, sir.

"Q. You knew nothing about it at all? A. No, sir."

The above testimony was given on the direct examination. The plaintiff's testimony in response to cross examination was in substance the same as that given on direct examination.

Mr. H. L. Ridgeway, a witness for the plaintiff, who was in the employment of the defendant Standard Oil Company at the time the plaintiff was injured, in response to questions regarding the conditions that existed and failure to give instructions to the plaintiff, testified as follows:

"Q. Were you there when Mr. Piner was injured? A. Yes, sir.

"Q. What position did you hold then? A. I was a utility man. A utility man who takes readings of all the pans around the yard. In the morning at 7 o'clock he takes the guages and finds out how much water, then he gets the temperature

and then he is supposed to draw water off these pans on any tank he is sent to draw on.

"Q. Are you familiar with pan 19 where Mr. Piner was injured? A. Yes, sir.

"Q. Are yau familiar with pan 15? A. Yes, sir.

"Q. Did you have occasion to do any work around pan 15 that morning? A. I guage those pans every morning at 7 o'clock to find out what the stills are putting in there.

"Q. Did you guage 15 pan? A. Yes, sir.

"Q. What did you find? A. I don't think there was anything in it.

"Q. Have you the original daily record that you made? A. Yes, sir; I have the record here of the book that show the guages from morning to morning.

"Q. Will you tell me what was in pan 15 on June the 15th, that was the day before the injury and what was in it on the 16th of June, 1928? A. On the 15th of June at seven o'clock there was practically nothing, it does not show any gross or net, blank, also on the 16th blank on pan 15.

"Q. Did you guage 19 on the 16th? A. Yes, sir.

"Q. What did you find? A. At seven o'clock two feet seven and three quarter inches oil, one foot six and three quarter inches water, subtract the water from the gross and that will give you,

"Q. Gross feet for pan 19 on the 16th of June, 1928, was two feet seven and three quarter inches? A. Yes, sir; that is the gross water one foot six and three quarter inches.

"Q Where was the water located? A. In the bottom of the tank, the water being heaviest goes to the bottom.

"Q. What was in the pan with the water? A. Naphtha as near as I can find out.

"Q. After you made that guage did you make your report? A. I always do at seven when I guage them if there is anything extraordinary I am supposed to report it to the man in charge of the shift.

"Q. Did you see Mr. Cooper (defendant herein) that morning? A. Yes, sir.

"Q. Did you see Mr. Hunt? A. Yes, sir.

"Q. Did you see Mr. Piner? A. No, sir; I did not see him at seven but he was in the yard.

"Q. Were you present when instructions were given to Mr. Piner to put water in this tank? A. Yes, sir.

"Q. Where were those instructions given? A. In the main pump house I gave the guage and he told Mr. Piner to go to the 19 pan and help them put the water hose in the top of the tank through the hatch, as near as I remember he said a foot of water.

"Q. Did Mr. Hunt give any instructions how to put the water in? A. No, sir.

"Q. Was Mr. Cooper present then? A. Yes, sir.

"Q. Did you make any statement to Mr. Cooper? A. I mentioned to Mr. Cooper that the oil was hot and the tank gassy.

"Q. What reply did Mr. Cooper make? A. He said well we have orders to put a foot of water in there and we will have to take a chance on it, I said I have the guage and the gross and it is up to you.

"Q. What did he do? A. He and Mr. Hunt went out and I went by 146 tank and hung around there, I wanted to see what would happen, I thought there would be something like that, in fact Mr. Houston told me one time he was assistant Superintendent (objected to).

"Q. Had you ever received any warning about placing water in the top of a tank? A. Not to my knowledge.

"Q. In the 6 years you were there did you ever see any bulletin about that? A. Not about water, no, sir.

"Q. Did you see the explosion? A. When I heard the report I looked over there and saw the tank cover go up in the air, I did not know where the man was, I ran up there and the whole place was ablaze and the man was under the

cover, the cover fell and rested on the fire wall and he was there and the whole thing was on fire.  *  *  *

"Q Do you know whether or not there are any facilities, or were up to the time that Piner was injured, for placing water in the bottom of the tank? A. There were no facilities other than to go through the top of the tank.

"Q. Did they have any facilities for getting the oil out without putting water there? A. No, sir.

"Q. There was no adjustable suction there? A. No, sir.

"Q. In order to get the oil out you had to raise the level of the oil? A. That is what they wanted to do and they put the water in to raise the level.

"Q. Pans 19 and 15 are both alike? A. 19 is smaller.

"Q. How is it constructed? A. It is a round tank ten feet 7 inches high and I judge 30 feet in diameter, it is a smaller pan than 15.

"Q. What does it rest on? A. On the ground.

"Q. What surrounds it? A. Dirt and cinders.

"Q. What is the ground between pan 15 and pan 19? A. As near as I can recollect it is full of coal cinders and dirt and gravel.

"Q. What is the distance between pan 15 and 19? A. I guess around 250 or 300 feet, I would not like to say exactly.

"Q. About how long was the hose they were using that morning? A. About 300 feet, I guess.

"Q. Do you know what the usual water pressure is in the yard? A. No, sir.

"Q. Do you know whether or not tank 19 was equipped with any device to take care of static electricity? A. No equipment."

The testimony tended to show that the tank involved did not have proper facilities for placing water in the bottom of it, which was necessary in order to raise the level of the oil so that the oil could be gotten out of the tank at the top, and, according to the testimony, the plaintiff was ordered to

do this on the occasion in question when the explosion occurred, without being warned of the danger, though it was known to the defendants that the plaintiff was uneducated, inexperienced, and ignorant of the danger. At least this was a reasonable inference to be drawn from the testimony, and when the plaintiff, in obedience to the orders of the person in charge (the defendant Cooper), inserted the hose at the top of the tank into the fluid contained therein the explosion occurred, caused by static electricity, generated by friction in pulling the said hose over gravel and cinders immediately before the explosion; the plaintiff being ignorant of the effect of pulling the hose over the gravel and cinders and of putting the hose into the fluid under the conditions existing. The fact that there was thick vapor in the tank when the plaintiff was ordered to perform the act above named was a matter for the consideration of the jury in connection with the other facts testified to in reaching a conclusion as to what caused the explosion and as to what negligence, if any, on the part of the defendants was responsible for the same. The record shows that the defendants admitted that the fluid contained in the tank was highly explosive. According to the record, the trial Judge, during the trial of the case, stated: "They admit that the stuff in the tank was highly explosive." Following this statement of his Honor, counsel for defendants stated: "We admit that naphtha is highly explosive, that a spark will set it off, whether from a match, electric spark or spark of any kind." There was testimony to the effect that the tank in question was not properly grounded, contained no equipment to take care of the static electricity, and was not properly protected; that its construction and erection did not conform to methods now in use, and the condition in which it was allowed to stand under the circumstances was evidence of a failure on the part of the corporate defendant, if not both of the defendants, to perform the duty to the plaintiff required under the law and the existing circumstances. In this

connection, we call attention to the testimony of Dr. Thomas F. Ball, head of the department of electrical engineering at the University of South Carolina, which throws considerable light on the questions involved: What caused the explosion; the cause of static electricity; and what safeguards should have been used; the results that may be expected to follow upon the failure to use safeguards such as he described in the course of his testimony. Attention is directed to the following testimony of Dr. Ball:

"Q. In determining what is the cause of an explosion in a tank of oil what facts would you have to take into consideration? A. I would first want to look at the ground to see if it was loose soil, sandy and hence dry or whether it was closely compact, I would look at the proximity of things of a explosive nature, I would want to know the foundation of the tank and the material the tank was made of, the size and shape of the tank, also what was in the tank, how it was put in there, how it was drawn out, the temperature of the liquid, if there be liquid in it; the temperature of the air or gasses inside the tank, the temperature of the air outside the tank and the relative humidity.

"Q. Now, what is static electricity? A. Static electricity is electricity which is caused by the rubbing of one body upon another. I will be very glad to demonstrate that before the jury. What I have here is known as an electroscope, an instrument for showing the presence of an electrostatic charge, I take this muffler which is part wool and part cotton, this is hard rubber on that stand, here is a piece of metal, I am going to rub this with the muffler and show you the presence of a charge. Now I would like to illustrate this point, you not only get one kind of charge but you get another charge on this if you want to feel it. Another thing I would like to show you and that is how easy it is to get a tremendous voltage, each of those devices is one hundred volts, this instrument shows about 2,000 volts, the ordinary

electric light has one hundred and ten volts, so you see the potential you can build up by friction is tremendous.

"Q. Now, professor, I desire to submit to you a few hypothetical questions: assume that on a slightly cloudy day with temperature of approximately 80 degrees Fahrenheit with the humidity at 8 A. M. being 83 degrees and at 12 noon being 74 degrees, a steel tank approximately ten feet high and approximately 40 feet in diameter with a steel cover containing an opening of approximately 20 inches in the top by 20 inches containing approximately one foot and six inches of water at the bottom and one foot four inches of naphtha on top at 11:30 midday, what, in your opinion, would be the condition of the naphtha and the gases at the top of the tank between the naphtha and the roof? A. Those facts that you have stated are most favorable for an explosion; the naphtha fumes being mixed with due air under these conditions are extremely explosive.

"Q. Assume that you take a regulation canvas fire hose three inches in diameter approximately 300 feet long with a metal nozzle on the end and drag it over cinders and gravel at a speed a man would ordinarily walk dragging such a hose, what, in your opinion, would be the condition of the hose relative to electricity, if any? A. I would say that the hose would be statically charged by friction.

"Q. Assume that on a slightly cloudy day with a temperature of approximately 80 degrees Fahrenheit with the humidity at 8 A. M. being 83 and at 12 noon 74, a steel tank ten feet high, approximately forty feet in diameter with a steel cover with an opening of approximately 20 inches by 20 inches at the top, said tank not being grounded or equipped with any appliance to take care of static electricity and containing approximately one foot six inches of water at the bottom and one foot four inches of naptha on top of the water for the entire day until 11:30 midday, that water under 70 pounds to the square inch pressure was turned into the top of that tank above the liquid through a regula-

tion canvass fire hose three inches in diameter, with a metal nozzle, the hose being approximately 300 feet long and having been dragged approximately 200 feet over cinders and gravel at the speed at which a man would ordinarily walk, what, in your opinion, would occur? A. I think the water being turned on under pressure of 70 pounds would be sufficient to cause an increased electro-static potential or voltage which would raise the voltage of the nozzle above what it had normally been and hence the chances for a spark to jump would be great.

"Q. Now if that tank under those same conditions had been equipped with something to take care of the static electricity what would have occurred, if anything? A. I think if it had been properly grounded the chances of an electrostatic discharge would not have been so great.

"Q. Would it make any difference whether the tank happened to be 30 or 40 feet in diameter? A. Not at all.

"Q. Have you recently made any experiments in your laboratory to confirm the answers you have given here today on the witness stand? A. I have, yes, sir."

In connection with this testimony of Dr. Ball, atention is also called to the statement of the plaintiff to the effect that when the hose hit the tank the explosion occurred.

From the testimony in the case, it is our opinion that the jury might reasonably draw the inference that the explosion was caused by static electricity, generated by pulling the hose in question over gravel and cinders, for which acts, and the failure to give the plaintiff proper instruction and warning, both of the defendants, under the testimony, may be held responsible and liable to the plaintiff for his alleged injuries; that in addition to being convicted of these acts, along with its codefendant, the jury might also, under the testimony reach the conclusion that the corporate defendant, Standard Oil Company, was guilty of negligence, gross negligence, and willfulness in the failure to properly ground the said tank to care for static electricity, and to place at the

bottom of said tank the necessary equipment for putting water therein from the bottom, so as to avoid putting the water in from the top, which act was known to the defendants to be dangerous. Whether these several acts or either of them, mentioned in the testimony adduced at the trial, in response to the allegations, constituted negligence on the part of the defendants and were the cause of the explosion and the resultant injuries to the plaintiff, as a proximate cause thereof, in our opinion was a question for the jury. While citation of authorities is not necessary to sustain the action of the trial Judge in overruling defendants' motion for a nonsuit (no motion was made for direction of a verdict), attention is called to the following cases: *Taylor v. Winnsboro Mills,* 146 S. C., 28, 143 S. E., 474, 477; *Hopkins v. Southern Cotton Oil Co.,* 144 S. C., 400, 142 S. E., 615, 617; *Lester v. Railway Co.,* 93 S. C., 396, 76 S. E., 976; *Kell v. Rock Hill Fertilizer Co.,* 123 S. C., 199, 116 S. E., 97, 99. We quote from the above cases as follows: "It is too well settled in this state to require the quotation of authorities to show that a master must exercise care to furnish his servant a reasonably safe place to work; however, the following cases sustain this principle: *McKain v. Camden Co.,* 89 S. C., 378, 71 S. E., 949; *Thomason v. Mfg. Co.,* 95 S. C., 239, 78 S. E., 895; *Mann, Adm'r v. Railway,* 138 S. C., 251, 136 S. E., 234." *Taylor v. Winnsboro Mills, supra.*

"When the plaintiff showed that the instrumentality in question was not in proper condition, a *prima facie* case of negligence on the part of the master (the defendant) was made out, and he was entitled to have his case submitted to the jury. See *Trimmier v. Railway,* 81 S. C., 203, 62 S. E., 209; *Carter v. Oil Co.,* 34 S. C., 211, 13 S. E., 419, 27 Am. St. Rep., 815; *Branch v. Railway,* 35 S. C., 405, 14 S. E., 808; *Lasure v. Manufacturing Co.,* 18 S. C., 275; *Bunch v. American Cigar Co.,* 126 S. C., 324, 119 S. E., 828." *Hopkins v. Southern Cotton Oil Co., supra.*

"Here we have the proof of plaintiff's injury by some manner of defect in the applicance furnished by the master that at least furnished some *prima facie* evidence of negligence to go to the jury in the absence of any explanation or any rebutting evidence." *Hopkins v. Southern Cotton Oil Co., supra.*

"This is sufficient to show an omission of duty on the part of the master to carry the case to the jury." *Lester v. R. R. Co., supra.*

"Having furnished, with due regard to the nature of the work, a reasonably safe place, reasonably safe and suitable tools and applicances, an adequate force of competent help, and a reasonably adequate plan or system, including proper rules and regulations, for doing the work, in the first instance, the master's duty thence forward is to exercise due care to maintain those conditions by providing reasonably adequate supervision." *Kell v. Rock Hill Fert. Co., supra.*

In our opinion, the trial Judge properly overruled defendants' motion for a nonsuit.

Another question presented arises under exception 1, which reads as follows:

### EXCEPTION 1

"That his Honor, the trial Judge, erred in refusing to permit, in an action involving punitive damages, argument to the jury as to the effect of punitive damages upon the defendant in its relation to the general welfare of the community as a whole, the error being that punitive damages are a matter of community interest and the defendant was entitled to comment thereon in argument."

The transcript of record contains the following statement regarding the matter involved under this alleged error:

"While the counsel for the defendants was addressing the jury he commenced a certain line of argument on the subject of punitive damages. Counsel for the plaintiff thereupon objected to such argument. His Honor the trial Judge sus-

tained the objection, and thereupon directed the Court Stenographer to enter upon his minutes the following:

"During his argument, Mr. Buist, Counsel for the defendant, sought to argue the effect of punitive damages upon the Standard Oil Company in its relation to the general welfare of the community as a whole and to attack the damage suit system in the City of Charleston. This was objected to by counsel for the plaintiff, and the Court ruled that would not be a proper argument before the jury."

The ruling of the trial Judge, in our opinion, was proper.

Under exception 2, error is imputed to the trial Judge as follows:

### EXCEPTION 2

"That his Honor the trial Judge erred in charging the jury that the complaint alleged that the plaintiff was injured 'by reason of the alleged negligence, recklessness, wantonness and willfulness of the defendants, or either of them,' the error being that the complaint nowhere alleged disjunctive negligence of the two defendants."

The alleged error occurred while the trial Judge, in the course of his charge to the jury, was stating the issues. He was, it seems, reading in part from the pleadings and stating, off-hand, some of the allegations contained in the complaint. An incorrect statement by the trial Judge is presumed to be inadvertent, and, when such occurs, it is the duty of the party aggrived thereby, at some opportune time, before the conclusion of the charge, to call the matter to the judge's attention, and, failing to do so, should not be afterwards heard to complain. If his Honor, in the case at bar, failed to correctly state the issues reached under the pleadings, and the defendant's counsel regarded the incorrect statement as prejudicial to the defendant's rights, it was their duty to call the matter to the attention of the judge before the jury were sent to their room, and, having failed to do so, should

not now be heard to complain. The exception must be overruled.

Exceptions 3 and 4, which will be considered together, read as follows:

### EXCEPTION 3 and 4

3. "That his Honor the trial Judge erred in accepting from the jury a verdict for punitive damages against one only of two tort feasors in an action alleging joint and concurrent tort, the error being that verdict for punitive damages as to one only of two joint tort feasors is illogical and improper."

4. "That his Honor the presiding Judge erred in failing to set aside a verdict giving punitive damages against one only of two joint tort feasors in a cause of action based upon joint and concurrent negligence, the error being that such verdict is illogical and indicative of prejudice on the part of the jury and should have been set aside."

As pointed out in our consideration of exceptions 5 and 6, there was testimony adduced at the trial from which the jury might reasonably reach the conclusion and find that the corporate defendant, Standard Oil Company, was guilty of acts of negligence, gross negligence, and willfulness. for which the defendant Cooper could not, under the testimony, be held accountable; for instance; The failure to properly ground the said tank so as to care for static electricity; the failure to place at the bottom of said tank the necessary equipment for putting water therein from the bottom, which is the proper method, so as to avoid putting water in from the top by means of a hose inserted therein from the top, a method known to the corporate defendant to be dangerous and not in accord with improved methods.

As to the contention that punitive damages against one only of two joint tort-feasors in a cause of action based upon joint and concurrent negligence cannot stand, will state that giving to the complaint (which we have quoted

herein) a liberal construction, there were acts of negligence alleged against the corporate defendant which do not necessarily include the other defendant. Under the allegations of the complaint, each specification of negligence contained therein need not be referred back to the alleged joint acts. Furthermore, the testimony to which we have referred in our consideration of this question, which was admitted without objection (at least no question is raised before this Court as to its admission), must evidently have been received under the theory that it was responsive to the pleadings, and is now binding upon the parties and the Court as well. According to our view, the record amply sustains the trial Judge in refusing to disturb the verdict as to punitive damages.

The 7th exception was abandoned. The remaining exception, No. 8, imputes error to the trial Judge in refusing defendants' motion for a new trial. All questions raised under this exception having been considered in our discussion of the other questions presented by the appeal, we deem it unnecessary to consider the same further, and this exception is therefore overruled.

All exceptions are overruled, and the judgment affirmed.

MR. CHIEF JUSTICE BLEASE, and MESSRS. JUSTICES STABLER and COSGROVE concur.

MR. JUSTICE COTHRAN did not participate on account of illness.